IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

| | | |
|---|---|---|
| SCOTT TEEVAN | § | |
| VS. | § | CIVIL ACTION NO. 9:19cv53 |
| DIRECTOR, TDCJ-CID | § | |

REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Scott Teevan, proceeding *pro se*, filed this petition for writ of habeas corpus. This matter was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636 for findings of fact, conclusions of law, and recommendations for the disposition of the case.

Factual Background and Prior Proceedings

Following a jury trial in the 411th District Court of Trinity County, Texas, petitioner was convicted of attempted capital murder. *The State of Texas v. Scott Charles Teevan*, Cause No. 8503. He was sentenced to 50 years of imprisonment. The Texas Court of Appeals for the Fourteenth District affirmed the conviction. *Teevan v. State*, 2003 WL 21940491 (Tex. App.-Houston [14th Dist.] Aug. 14, 2003). Petitioner failed to file a timely petition for discretionary review.

Petitioner subsequently filed a state application for writ of habeas corpus. On February 1, 2006, the Texas Court of Criminal Appeals denied the application without written order based on the findings of the trial court. A second application for writ of habeas corpus was dismissed as subsequent on January 11, 2017.

Grounds for Review

Petitioner asserts the following grounds for review: (1) he is actually innocent based on new evidence; (2) the Court of Criminal Appeals improperly denied him access to memoranda written by staff explaining why his state applications were denied; (3) he received ineffective assistance of counsel because counsel: (a) failed to hire a firearms expert and (b) failed to investigate three eyewitnesses; (4) the prosecution relied on perjured testimony from Officer Turman; (5) the

prosecution withheld evidence from three eyewitnesses and (6) he was denied counsel and experts to assist him in connection with his applications seeking a writ of habeas corpus

## Evidence at Trial

In his appellate brief, petitioner summarized the evidence at trial as follows:

Steve Goodrow, a sergeant with the City of Trinity Police Department, testified regarding his knowledge of the incident. Sergeant Goodrow testified that on the morning of September 7, 2001, "I escorted [petitioner] before the Justice of the Peace, Judge Chandler, to be magistrated for a charge [of Unauthorized Use of a Motor Vehicle]. Our jail was designed as a holding facility to hold a prisoner up to 72 hours after they are arrested and magistrated. If they can't post the bond set by the magistrate, then they are transferred to the county jail."

Sergeant Goodrow testified that "between 7:00 [P.M.] and 8:00 [P.M.] . . . Deputy Shane Turman with the Trinity County Sheriff's Department," showed up to transport [petitioner] to the Trinity County Jail. Sergeant Goodrow testified that later that same evening, "I was dispatched to a call. To attempt to locate one of the Trinity County Sheriff's Department patrol cars. The same patrol car that Deputy Turman left the police department with with [petitioner]." Sergeant Goodrow testified that he located the patrol car "In the Glendale community. It was a Ford Crown Victoria. I passed it. I pulled over to the shoulder [of the] road . . . and was going to turn around and follow the vehicle . . . . As I pulled over to the edge, off the edge of the road to turn around, I had to wait for another oncoming car. And as it passed, I observed that it was a Department of Public Safety trooper vehicle. I again went ahead and turned around and proceeded to follow the highway patrol car."

Sergeant Goodrow testified, "And [the Ford Crown Victoria] stopped at-I observed it was kind of a curve there in the road, in the dirt road; and I had stopped. And I saw the trooper car stop in the middle of the road. So I got out of my car, and the trooper car was backing up. As it backed up to where I was at, I observed it was [Trooper] Kelly Wilkinson in the trooper car. [Trooper Wilkinson] told me that the [Ford Crown Victoria] was parked just around the curve in the ditch of the road. Myself and Trooper Wilkinson got out and approached the [Ford Crown Victoria] . . . and cleared it . . . ."

Sergeant Goodrow testified that a search was conducted to locate [petitioner]. Sergeant Goodrow testified, "[Petitioner] was seen . . . on the property adjacent to the Cowboy Church. [A] group of us loaded up and went across the road and searched the immediate wooded area. As we were walking-I was beside Deputy Turman-Deputy Turman pointed [petitioner] out to me. [Petitioner] was in the woods. When I saw [petitioner], I called out and gave [Petitioner] verbal commands to get on the ground, at which time [petitioner] refused to do that. [Petitioner] started running. I was giving [petitioner] verbal commands to get on the ground. [I observed a weapon] in [petitioner's] right hand. I continued to run towards [petitioner]. I took [petitioner] into custody and placed handcuffs on him, handcuffed him. On the ground after [petitioner] was handcuffed or while I was handcuffing [petitioner] I saw [a weapon-a small frame, semiautomatic, 9 millimeter] on the ground." On cross-examination, Sergeant Goodrow testified, "[petitioner] never pointed [the weapon] at me. I never observed [petitioner] pointing [the weapon] at me."

Deputy [Shane] Turman testified, "I arrived at the [City of Trinity] police department at about 8:00 P.M. to pick up a prisoner and transport him back to the county jail. [The prisoner was petitioner.] I placed handcuffs on [petitioner] behind his back before [petitioner] came out of the cell. We then took [petitioner] out of the cell.

Deputy Turman testified, "As we got into the city limits of Groveton and we were nearing the Department of Transportation building, I reduced my speed down to approximately 50 miles an hour and as-like I said, as we was coming into the city, [petitioner] reached over the seat, the front seat, and grabbed my weapon." Deputy Turman testified, "[Petitioner] grabbed my weapon. I immediately grabbed [petitioner's] hand to try and prevent [petitioner] from pulling [my weapon] out of my holster. As I grabbed [petitioner's] hands, [petitioner] began to head butt me and hit me on the right side of my head with his head. When I took a hold of [petitioner's] head, that's when [petitioner] pulled the weapon out of my holster. At that time, I grabbed [petitioner's] head; and I slammed on the brakes. And I-when I hit the brakes and when the car came to a stop I put the car in park. As I was releasing my seatbelt, I could hear the gun snapping fairly close to the back of my head.

Deputy Turman testified, "At that time, I did not have a bullet in the chamber [of the weapon]. You can just pull this trigger, and [the weapon] will not fire. The hammer will just continue to come back and fall-making a snapping noise. Fearing that [petitioner] would chamber a round as I exited the vehicle, I ran approximately 50 to 70 feet diagonally in front of the vehicle so I could retrieve my backup weapon."

Deputy Turman testified, "[Petitioner] had exited the vehicle and come around to the front of the car. And as I tuned around and was trying to retrieve my backup weapon, I could see [petitioner] was pointing my weapon that he had took directly at me and snapping [the weapon] again." Deputy Turman testified that the only way that the weapon would snap was, "By pulling the trigger." Deputy Turman testified, "After [petitioner] had-was pointing the weapon at me and snapping it, as I came out with my backup weapon, [petitioner] ran around and got . . . in the driver's door in the driver's seat and then drove off."

Deputy Turman testified, "I had my cellular phone on my belt. And at that time I called the Trinity County dispatcher and advised the dispatcher of what had happened. Approximately 60 to 90 seconds later another deputy had come and picked me up, and we began to pursue [petitioner]. We received a dispatch from the dispatcher there at the Trinity County jail that . . . the [Ford Crown Victoria] had been spotted by Trooper Wilkinson on Highway 94 going toward Trinity. The [Ford Crown Victoria] was finally located on Glendale Cemetery Road. By the time me and Deputy Jester had got there, the "[Ford Crown Victoria] had already been cleared." Deputy Turman testified that the search for [petitioner] continued through the night, and on into the next day. Deputy Turman testified that on September 8, 2001, "Me and Sergeant Goodrow of the Trinity Police Department had paired up and were searching in the woods when I saw [petitioner].

Deputy Turman testified, "I got Sergeant Goodrow's attention, and I pointed out [petitioner]. Sergeant Goodrow had hollered at [petitioner] telling [petitioner] to get down on the ground. At that time, [petitioner] started running back towards [FM] 356. [Petitioner] had pulled my weapon that he had took off me, pulled it out of his pocket and then threw it down on the ground and laid down on the ground. Deputy

> Turman testified that he checked the 9 millimeter weapon that [petitioner] had taken from him, and that "the clip was loaded, but [a bullet] was not in the chamber." Deputy Turman testified that in order for [petitioner] to make the weapon operate, "[Petitioner] would have had to pull the slide back and chamber a round." Deputy Turman testified that when [petitioner] pointed the weapon at him, Deputy Turman was in fear for his life.
>
> [Petitioner] testified regarding the incident. [Petitioner] testified that Deputy Turman picked him up at the City of Trinity jail; that [petitioner] was handcuffed in front of his body; that [petitioner] did grab for Deputy Turman's gun; that [petitioner] never actually got control of Deputy Turman's gun; that [petitioner] never head butted Deputy Turman; and that [petitioner] never pulled the trigger of the gun towards Deputy Turman.
>
> [Petitioner] testified that after the patrol vehicle came to a stop, "I opened the door and got out, walked around the front of the car. I looked up and saw [Deputy Turman] grabbing his leg. I thought [Deputy Turman] was reaching for a hide-away gun. So I scooted around the car and got in the driver's seat and turned the car around and left. I did not [have Deputy Turman's weapon]." [Petitioner] testified that only after he hit the brakes to make a power slide during the high speed pursuit, "[T]hat's when the gun hit the floor and went up under my feet."
>
> [Petitioner] testified that when he abandoned the patrol car, he took the weapon with him because "I didn't know what to do with it." Appellant testified that he never racked a round into the chamber of the weapon, and that he "took the clip out of [the weapon] while I had it." [Petitioner] testified that he never pointed the weapon at Deputy Turman or Deputy Goodrow; and that he never intended to hurt anyone. [Petitioner] testified, "I just wanted to get away."

## Discussion

***Limitations***

Petitioner's first, third, fourth and fifth grounds for review relate to his conviction and are referred to herein as the "Conviction Grounds for Review."

The Antiterrorism and Effective Death Penalty Act of 1996 establishes a one-year statute of limitations for state inmates seeking federal habeas corpus relief. *See* 28 U.S.C. § 2244(d). The one-year period is calculated from the latest of either (A) the date on which the judgment of conviction becomes final; (B) the date on which an impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the petitioner was prevented from filing by such state action; (C) the date on which the Supreme Court initially

recognizes a new constitutional right, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (D) the date on which the facts supporting the claim became known or could have become known through the exercise of due diligence. *See* 28 U.S.C. § 2242(d)(1)(A)-(D).

Petitioner's conviction was affirmed by the intermediate appellate court on August 14, 2003. His conviction therefore became final on September 15, 2003, when the time for filing a petition for discretionary review expired.[1] The period of limitations began to run on that date and ran for 326 days until August 8, 2004, the date petitioner filed his first state application for writ of habeas corpus. The running of the period of limitations was tolled while the first state application was pending. The period of limitations began to run again on February 1, 2006, the date the first application was denied, and expired on March 13, 2006, 39 days later.[2] As the current petition is dated April 3, 2019, the current petition was filed after the applicable period of limitations expired.

Petitioner does not assert that the state created an impediment to bringing a federal petition for writ of habeas corpus at an earlier time or that the Conviction Grounds for Review are based upon a newly recognized right. Further, as explained below, the Conviction Grounds for Review are not based on newly discovered facts that could not have been discovered earlier through the exercise of due diligence. Nor has petitioner demonstrated he is entitled to equitable tolling.

Petitioner does assert that he is actually innocent of the offense of attempted murder. In *McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013), the Supreme Court held that actual innocence may provide a "gateway" for consideration of otherwise time-barred claims. An actual innocence claim

---

[1] Texas Rule of Appellate Procedure 68.2(a) allows a defendant 30 days to file a petition for discretionary review.

[2] While 28 U.S.C. § 2244(d)(2) tolls the limitations period during the pendency of state habeas proceedings, petitioner did not file his second state application for writ of habeas corpus until after the period of limitations expired. Accordingly, the filing of petitioner's second state application did not cause the period of limitations to be tolled. *Scott v. Johnson*, 227 F.3d 260, 263 (5th Cir. 2000) (no statutory tolling if the state habeas action is filed after the limitations period has expired).

requires a petitioner to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). However, it is not the mere allegation of actual innocence that will open such a "gateway;" instead, a petitioner seeking to avoid a limitations bar must present "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial." *Id*. at 1936. In other words, an "actual innocence" exception to the limitations bar will only be found if the evidence presented by the petitioner convinces the court that "it is more likely than not that no reasonable juror would have convicted [petitioner]." *Id*. at 1933. Further, in order to constitute new evidence, the evidence must have been unknown at the time of trial and not discoverable with reasonable investigation. *Hancock v. Davis*, 906 F.3d 387, 390 (5th Cir. 2018).

Petitioner cites two types of evidence in support of his claim to be actually innocent. First, petitioner states three eyewitnesses were interviewed by Deputy Turman. He states these witnesses were not disclosed by the prosecution and were not interviewed by defense counsel. Petitioner contends the witnesses told Deputy Turman that they did not see petitioner in possession of a pistol. In connection with his second state application for writ of habeas corpus, petitioner filed copies of statements two of the three witnesses gave to Deputy Turman prior to trial. He also filed an affidavit from one of the witnesses that was executed several years after the trial. Petitioner states that during trial, Deputy Turman testified about interviewing an adult female and two female juveniles. Deputy Turman testified he did not recall the name of the adult female.

In addition, petitioner states Deputy Turman provided false testimony at trial. He states that while the deputy testified his weapon made a "snapping sound" when petitioner attempted to fire it, the weapon will not generate a "snapping sound" in connection with repeated "dry-firing." Petitioner states the weapon has an internal hammer that requires the slide to be activated each time to fire the weapon or even to have the hammer hit a dry chamber. In support of this assertion,

6

petitioner filed an affidavit from James Edward Demoss, a fellow inmate. Mr. Demoss states that in 1986 he completed a home study course on gunsmithing and obtained a federal firearms license. He also states he is somewhat familiar with type of firearm petitioner was accused of using. Mr. Demoss supports the assertions regarding the deputy's weapon that are described in the second and third sentences of this paragraph.

Petitioner has failed to establish he is entitled to proceed through the gateway established by *McQuiggin*. The evidence Petitioner describes is not new. Petitioner acknowledges Deputy Turman testified during trial about interviewing the three eyewitnesses. As a result, petitioner has been aware of their existence since the time of trial. Moreover, if the testimony given by Deputy Turman concerning the gun making a "snapping sound" was false because of how the weapon operated, there is no reason a firearms expert could not have been hired at the time of trial to attack the deputy's testimony.

For the reasons set forth above, the evidence petitioner describes as new was either known at the time of trial or could have been discovered with reasonable investigation. *McQuiggin* therefore does not apply here and consideration of the Conviction Grounds for Review are barred by the applicable statute of limitations.[3]

### *Infirmities in Connection with State Habeas Proceedings*

Petitioner's second and sixth ground relate to the applications he filed in state court seeking a writ of habeas corpus. These grounds for review do not provide petitioner with a basis for relief in this proceeding because infirmities in state habeas proceedings are not grounds for federal habeas

---

[3] Petitioner asserts that the failure to investigate the three eyewitnesses and to hire a firearms expert was the result of counsel's ineffectiveness. However, the United States Court of Appeals for the Fifth Circuit has made "no distinction between the treatment of ineffective assistance claims and other claims when addressing whether an actual innocence claim was sufficient to [overcome] a time bar." *Tyler v. Davis*, 768 F. App'x 264, 265 (5th Cir. 2019).

relief. *Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004); *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999).

## Recommendation

This petition for writ of habeas corpus should be dismissed.

## Objections

Within 14 days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings of facts, conclusions of law and recommendations of the magistrate judge. 28 U.S.C. § 636 (b)(1)(C).

Failure to file written objections to the proposed findings of facts, conclusions of law and recommendations contained within this report within 14 days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings, conclusions and recommendations and from appellate review of factual findings and legal conclusions accepted by the district court except on grounds of plain error. *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1429 (5th Cir. 1996) *(en banc)*; 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72.

SIGNED this 13th day of May, 2022.

Zack Hawthorn
United States Magistrate Judge